**CALMES v. HYMAN.**

**THE IROQUOIS.**

No. 1323.

United States District Court
E. D. Louisiana, New Orleans Division.

May 6, 1953.

City of New Orleans, State of Louisiana, and owner of the yacht.

3. On or about November 4, 1946, the yacht Iroquois, a vessel with a length of 53 feet and maximum beam of 13 feet, 9 inches, was owned by the United States of America, and at that time was lying in the Industrial Canal at New Orleans, Louisiana. The vessel was in Naval service of the United States during the late war.

4. On or about November 4, 1946, respondent, veteran of the armed forces of the United States, purchased the yacht Iroquois from the Government, at what was known as a veteran's fixed price sale. The vessel was purchased "where is, as is", and was in very poor condition. One of her two engines was completely dismantled. It bore signs of rubbing in the upper part of the hull, a little forward of midship, and some of the planking and a rib were broken. Her rails were in a generally dilapidated condition. The Calmes yard having been recommended to Hyman, Hyman communicated with John W. Calmes, informed Calmes that he had purchased a yacht and wanted it repaired. He asked Calmes to make an inspection of the vessel, and to give him a written bid for the necessary work. Hyman specified that he wanted the boat put back as nearly as possible in its original condition.

5. On or about November 7, 1946, Calmes, having made an inspection, went to Hyman's office and delivered to Hyman a written proposal to repair the hull and super-structure, assemble and test the engines, and paint the entire vessel in and out, all for the sum of $3,748.

6. At the time that Calmes delivered the written proposal above described, Calmes informed Hyman that he could do a much better and cheaper job on a cost-plus basis. Calmes informed Hyman that his overhead was 65%, and his profit 15%. It was then orally agreed that Calmes would do the work at cost of labor and materials plus 80% of the direct labor cost, said 80% representing 65% overhead and 15% profit. It was further agreed that machine time would be charged for at the rate of $1 per hour, the use of a crane at the rate of $68

John D., M. A. & Edwin H. Grace (by Edwin H. Grace), New Orleans, La., for libellant.

Monroe & Lemann, and Robert G. Polack, New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

This is a suit in Admiralty, in personam, brought by John W. Calmes, doing business as Calmes Engineering Company, against Harris Hyman, Jr., as owner of the yacht Iroquois, in the sum of $9,728.58, claimed to be the balance due Calmes for certain repairs, services and supplies made and furnished by Calmes to the yacht Iroquois. Respondent Harris Hyman, Jr., denies that he is indebted to Calmes in any sum, and alleges that, on the contrary, Calmes is indebted to him for damages sustained by him by reason of inefficient, careless and negligent performance of work done by Calmes on respondent's yacht Iroquois, and respondent has filed his cross-libel seeking recovery in the sum of $15,000 for such damage.

After considering the pleadings, the evidence offered by both parties, and the law, the Court makes the following findings of fact and conclusions of law:

Findings of Fact

1. Libellant John W. Calmes was at the time suit was filed domiciled in and doing business in the City of New Orleans, Louisiana, under the name and style of Calmes Engineering Company, and under that name owned and operated a shipyard on the Industrial Canal, New Orleans, Louisiana, for the repair of ships, tugs, barges and other similar water craft.

2. Harris Hyman, Jr., respondent, was, at the time suit was filed, a resident of the

per day, and of metal spray equipment at $6 per day. Subsequently, during the progress of the work it was agreed that the 80% should be reduced to 60%.

7. Calmes represented that his yard was fully equipped to perform the work, and agreed to have the job finished by December 15, 1946.

8. Hyman authorized the Navy to turn the vessel over to Calmes, and it was brought to Calmes' yard.

9. At the yard, the boat was lifted out of the water by power crane and slings, which are hereinafter more fully described, and placed on the bank of the Industrial Canal, on shoring formed by heavy timbers.

10. On or about November 13, 1946, an employee of Calmes furnished Hyman with a written proposal captioned

"Machine Shop & Shipyard
Mr. Hyman

Additions To Job Order No. 2534".
The proposal contains some 88 items of work to be done on the vessel. Upon examining the document, Hyman informed Calmes' employee that many of the additions were covered by the original proposal. The employee explained that to avoid misunderstanding the list contained all work to be done. Inquiry by Hyman as to how much the job was to cost elicited the reply that the cost would be in the neighborhood of $6,800, to which Hyman orally agreed.

11. To assist the shipyard in returning the boat to its original condition, Hyman obtained from the original owner, whose name he learned from the Navy, a photograph of the vessel as it appeared prior to conversion by the Navy. Hyman also obtained, from the Elco Boat Works, builder of the vessel, her original drawings and blueprints. Hyman conceded at the trial that the work he was ordering done entailed a great deal more expense than merely putting the vessel in running condition. It was a case of a man able to afford it wishing to gratify a whim.

12. After the boat was out of the water and on the Canal bank, Hyman employed one Robert O. Carseth, a professional yachtsman, to observe and report to him on the progress of the work. Carseth's employment commenced about January 15, 1947, and he was to be the Captain of the yacht upon completion of the work. Besides Carseth, Hyman himself spent a great deal of time at the shipyard, and it is clear that he frequently authorized additions to and changes in the work originally contemplated. There is no evidence that Hyman otherwise interfered with the orderly progress of the work.

13. While in the yard, the yacht was lifted from the shoring, on which it was resting, in connection with work done on the shaft. To perform this lifting operation, two wire bridles were passed underneath the hull, about 10 feet fore and aft of midship. These wire bridles were fastened to a single spreader-arm, which spreader-arm ran athwartship. To the spreader-arm was attached a cable, which in turn was attached to a power crane. The spreader-arm was 8 or 9 feet long, while the maximum beam of the vessel was 13 feet, 9 inches. The lifting of the vessel to the height required to do the work with a spreader-arm so much shorter than her beam was wide caused the bridles to pinch the hull, with the result that a stringer in the hull at about deck level was fractured, and the panelling in the interior of the vessel was cracked. The stringer was subsequently repaired by being spliced, and the cracks in the interior panelling were covered with wood strips. It is not possible to ascertain from the evidence the cost of making these repairs to the stringer and panelling.

14. It is clear from the record that the Calmes yard was not fitted either by experience or equipment to perform fine yacht work. The work customarily done by that yard was on water craft of steel construction, and on barges of heavy wood construction.

15. The workmen who performed work on the hull had had no experience on yachts, their previous experience having been limited to wooden barges and work of similar rough character.

16. The work of sanding the hull was inefficiently performed, with the result that the hull was badly scarred by gouging.

Putting it another way, the power sanding machine was permitted by inefficient and inexperienced workmen to remain too long in various spots, so that in those spots the sanding was considerably deeper than in others. Painting did not conceal these depressions in the surface of the hull.

17. During the progress of the work the vessel was on the opposite side of the yard and about 125 feet from the main shop building. Within 4 or 5 feet of the vessel was a heavy boom. The location of the boom so closely adjacent to the vessel interfered with the efficient performance of the work. Much of the small work which required the use of power tools was done in the main shop building, and to get from one location to the other it was necessary for workmen to traverse this distance and to go around the boom. Many power tools which are ordinarily employed in yards doing yacht work were not provided by Calmes, and consequently much work was done manually which might have been done by power tools, had such tools been available.

18. From time to time Hyman paid Calmes sums aggregating $10,000 on the contract. The last of such payments, one in the sum of $5,000, was made on January 26, 1947.

19. About the middle of February, 1947, the work was still far from being completed, and it appearing to Hyman that the job might prove endless, both as to cost and completion, he ordered Calmes to stop work and to place the vessel in the water. On the trial Calmes claimed that because the work was done on a cost-plus basis he was unable to state what had and what had not been completed at the time Hyman ordered work stopped. However, it is clear from the evidence that the interior floors were torn up; no doors had been hung; the decks had not been scraped; the hand rails had been made but not installed; none of the hardware was in place; that except for the hull, which had received one coat of paint, none of the interior or exterior had been painted; the screens had not been provided; the mast was not up; no electric fixtures had been installed, and no electrical circuits connected; the lighting wire hung from the ceiling, and no linoleum had been laid on interior floors.

20. In compliance with Hyman's demand, work was stopped and the vessel, by means of crane and slings as previously described, was placed in the water. It was then brought to the Viking Boat Yard for completion of the work.

21. On or about February 20, 1947, Calmes rendered Hyman a bill for repairs and alterations to the Iroquois totalling $19,728.58, with a credit of $10,000 representing the amounts paid on account, leaving a balance allegedly due Calmes of $9,-728.58. The total charge of $19,728.58 is made up as follows:

| | | | | |
|---|---|---|---|---|
| Labor | — | $5,562.69 | | |
| Plus 80% | — | 4,450.16 | — | $10,012.85 |
| Labor | — | 3,004.91 | | |
| Plus 60% | — | 1,802.95 | — | 4,807.86 |
| Total labor, overhead and profit | — | | | $14,820.71 |
| Materials | — | | | 4,678.47 |
| Machine hours, 150.6 @ $1.00 per hr. | — | | | 150.60 |
| Metal spray " 1.8 " $6.00 " " | — | | | 10.80 |
| Crane time 1 day | — | | | 68.00 |
| | TOTAL | | — | $19,728.58 |

From a reading of the itemization of the repairs and alterations which the bill purports to cover, it would appear that all of the work listed on the bill had already been performed. However, that is far from being true.

22. Arthur A. Grant, a marine surveyor of long experience for insurance purposes, inspected the Iroquois before any work was done on it. At that time he estimated that it would cost the sum of $10,000 to put the yacht in good operating condition for a vessel of its type, and that after spending such sum the yacht would be worth between $15,000 and $20,000.

23. After the Iroquois was brought to the Viking Boat Yard, Hyman had Grant examine Calmes' itemized bill of February 20, 1947, and estimate the proper cost of the work covered by said bill. Hyman also had Grant inspect the yacht to ascertain the extent to which the work covered by the bill had actually been completed. Grant estimated that a fair cost of the work covered by the bill would be $15,264. From his examination of the yacht he determined,

that the work was about $5,000 short of completion. Putting it another way, on Grant's estimate of roughly $15,000 for the whole job, the work was about two-thirds completed. Calmes' charge of $19,728.58 is for work completed to the date of the rendition of the bill. So that if the job was only two-thirds completed at that time the charge of $19,728.58 represents only about two-thirds of what the ultimate cost would have been to Hyman if he had permitted the yacht to remain at the Calmes yard. On this basis, assuming that the work would have proceeded as it had in the past, the total job would have cost Hyman something over $29,000, a figure out of all reason.

24. It is clear that but for Calmes' inefficiency, lack of skill and of proper facilities and equipment the job could have been completed for the sum charged.

25. The evidence adduced by Calmes that the labor and materials charged to the job were actually expended on it is in the main uncontradicted, notwithstanding that Hyman has at all times, during the progress of the job and since, had access to Calmes' time and material records. It is true that Hyman was able to show some instances where indirect labor was charged as direct, with the result that he was improperly charged with overhead, but these instances were few in number and relatively inconsequential in amount.

26. Hyman expended sums aggregating $4,973.23 in having the work completed and in having corrected and redone work improperly performed by Calmes. Hyman is entitled to recover this sum from Calmes.

27. It is difficult to assess the damage sustained by Hyman by reason of the gouged hull, and the broken stringer and interior panelling. But considering that the Iroquois is a pleasure yacht; that Calmes undertook to return the vessel to her original condition: that beauty of appearance is an important feature of such a vessel, and considering further the seriously marring effect on the vessel because of the extent and location of the gouging and the broken panelling, the damage is substantial. An allowance to Hyman of $1,500 for the gouging and $500 for the

interior damage is reasonable. A credit to Hyman of $250 against the total charge made by Calmes would seem to be reasonable for the cost of repairing the broken stringer. The damage having been caused by Calmes' inefficiency and negligence, Hyman should not have been charged with the cost of repairing it.

### Conclusions of Law

1. This court has jurisdiction of the parties and of the subject-matter.

2. Libellant is entitled to recover of respondent-cross-libellant the sum of $9,728.58, less a credit of $250.

3. Respondent-cross-libellant is entitled to recover of libellant the sum of $6,973.23.

Judgments may be entered accordingly.